IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PRINCE D. KEY,

                Plaintiff,

   v.

MEREDITH MASHAK, KEISHA PERRENOUD,                    OPINION and ORDER
SALAM SYED, ELLEN O'BRIEN,
WILLIAM CONROY, TRISHA ANDERSON,                        17-cv-395-jdp
PAMELA SCHMIDT, and DON MORGAN,[1]

                Defendants.

---

      Plaintiff Prince D. Key injured his right knee playing basketball in 2014. Key, appearing pro se, alleges that defendant prison officials ignored his medical problems, persisted in providing him with inadequate treatment, and forced him to kneel in his cell despite his severe knee pain. He brings claims under Eighth Amendment and Wisconsin medical-malpractice or negligence theories. Defendants, who removed the case from state court to this court, have filed a motion for summary judgment, Dkt. 32. I will grant that motion for all of Key's Eighth Amendment claims and a portion of his state-law claims. Some of Key's claims are barred on claim preclusion grounds and he otherwise fails to show that any of the defendants consciously disregarded his medical needs. I will remand the remaining Wisconsin-law claims to state court.

---

[1] I have amended the caption to reflect the proper spelling of defendants O'Brien's and Anderson's names, as reflected in defendants' summary judgment materials.

UNDISPUTED FACTS

Except where noted, the following facts are undisputed.

**A. Parties**

Plaintiff Prince D. Key is currently incarcerated at Wisconsin Secure Program Facility. The events at issue in this case took place while Key was incarcerated at Columbia Correctional Institution (CCI). Most of the defendants were employed at CCI: Meredith Mashak was a nurse who was the CCI health services manager, Salam Syed was a physician, William Conroy was a correctional officer, Trisha Anderson was a nurse who served on CCI's Special Needs Committee, and Pamela Schmidt and Don Morgan served on the committee as non-medical staff members. Defendant Ellen O'Brien was employed by the Department of Corrections as an orthopedic doctor; I take the parties to be saying that she did not work at CCI. Keisha Perrenoud was a nurse employed as the DOC's Bureau of Health Services nursing coordinator.

**B. Treatment for knee injury**

Key injured his right knee while playing basketball in November 2014. In his initial assessment in the Health Services Unit, a non-defendant nurse noted that Key had a limping gait and that he was guarding his right lower leg but that it was bearing weight. The nurse noted that Key's right patella joint was warm and swelling. She felt a popping on the anterior center of the knee above the joint with movement and pain.

Key was seen by Dr. Karl Hoffman (also not a defendant in this case) on January 21, 2015 to evaluate his injury. Hoffman noted some fluid buildup in the knee. After performing stress tests to the knee, Hoffman noted that Key had some discomfort when exposed to "valgus" stress, or movement inward. Hoffman suspected a torn lateral meniscus in the right knee and he ordered a trial of physical therapy. He noted that if the knee did not improve

2

through physical therapy and conservative options, he would consider an MRI and orthopedic consultation.

Key participated in six physical therapy sessions in February and March 2015. The March discharge record shows that Key said that he felt "60% better." Dkt. 30-1, at 267. Key says that he did not say this, but it's undisputed that the record contains this note.

Defendant Dr. Syed took over Key's treatment from Dr. Hoffman. Syed saw Key on April 23, 2015. Syed noted that Key had been prescribed naproxen for pain in January and he had been prescribed a knee sleeve in February. Syed ordered Key to ice his right knee four times a day for 20 minutes as needed. Although Syed does not note it in his declaration, Key's medical records show that Syed also prescribed Key acetaminophen 1000 mg and arranged for further physical therapy. *See* Dkt. 30-1 at 84, 136, 414. Key was unable to attend physical therapy for at least part of the summer because he was being held in segregation.

On July 27, 2015, Syed again saw Key regarding his right knee pain. He reviewed Hoffman's notes stating that if the injury did not improve with conservative treatment, Hoffman would consider an MRI and an orthopedic consult. Because Key reported that he was still in pain, Syed decided to order an MRI and a consultation with orthopedics. The parties do not explain whether an orthopedics consultation was carried out. Syed again prescribed ice and naproxen 500 mg twice a day for Key's pain.

On August 28, 2015, Key had an MRI of his right knee. The report stated that the medial and lateral menisci were intact, and that there was "partial-thickness fissuring within the cartilage of the lateral trochlea." *Id.* at 264. I take the main point of this report to be that Key had suffered cartilage damage.

3

In early September 2015, Key resumed physical therapy. But the medical record shows that Key refused to go to his physical therapy session on September 14; he instead spent time in the law library. Key objects to this fact as hearsay and because defendants "offer no proof/evidence on this issue." Dkt. 40, at 1. But defendants' evidence is the note itself, which likely is admissible given the business-records exception to hearsay. *See* Federal Rule of Evidence 803(6). In any event, the truth of whether Key actually refused to go to the session is not the important issue; the record states that Key refused, and defendants can use that record to show how it informed their later decisions. Key appeared for several other therapy sessions until discharge from therapy in late October.

On October 9, 2015, Syed saw Key for a follow-up visit. Based on the results of the MRI, Syed concluded that a specialist should determine his plan of care. Syed gave Key a cortisone injection for his pain and referred him to orthopedist Dr. O'Brien.

On November 12, 2015, O'Brien reviewed Key's records and MRI. O'Brien concluded that the results were consistent with a "lateral tracking" patella, meaning that the kneecap moves too far to the outside when the leg is bent. This condition often responds to physical therapy. O'Brien noted that Key was currently unavailable to be seen because his unit was shut down following an assault on a guard, but that a physical therapist should evaluate his right knee. Syed followed through on O'Brien's recommendation by ordering physical therapy for Key. On December 11, Syed renewed Key's prescription for naproxen 500 mg.

In mid-December 2015, O'Brien sent Key a memo advising that he had good results with physical therapy in February 2015 and that his condition should improve with additional physical therapy. She stated that outside providers expect patients to attend physical therapy and adhere to the plan of care. Key says that he did not receive the memo, but it's undisputed

that the memo was in his records. Key says that he did not have good results from his previous therapy and that he had to stop because of increased pain and aggravation of the injury. But that is not reflected in the contemporaneous therapy records.

Around that time, O'Brien also wrote a note stating that Key had been transferred back to segregation. This meant that Key could not receive physical therapy until he was released back to general population. According to O'Brien, physical therapy is important to rehabilitate an injury, and even if it is not entirely successful, therapy builds strength and better prepares the patient for recovery if surgery is necessary. O'Brien generally will not move to follow-up treatments like imaging or surgery until therapy is completed. O'Brien will not see patients who fail to cooperate with the course of treatment, including therapy.

On March 16, 2016, O'Brien wrote a report stating that Key had refused physical therapy and that he had failed to display cooperative behavior. She determined that Key needed to complete his physical therapy or obtain a referral from physical therapy in order to be seen by her.

On June 20, 2016, Syed referred Key back to physical therapy so he could complete it and be seen by O'Brien. Syed prescribed muscle rub and he renewed the naproxen prescription. Although defendants do not include it in their proposed findings, Syed also prescribed Key another medication—nortriptyline, an antidepressant sometime prescribed for pain. Dkt. 30-1, at 79, 131. Syed's progress note states that during this meeting Key reported that he could perform 100 to 150 jumping jacks before his knee started hurting, Key says that this mischaracterizes his statement at the meeting: he was telling Syed about his ability before the injury.

5

Key was transferred to WSPF in August 2016. He had a second MRI of his right knee in December 2016, showing "no evidence of a meniscal tear." *Id.* at 382. The "Impression" section of the report noted a "Normal study." *Id.* On October 13, 2017, he had a surgical procedure on his knee to debride his patellar fat pad and dangling cartilage. O'Brien says that the results of that procedure were expected given Key's history of patellar tracking. She also says that requiring Key to complete physical therapy before receiving further treatment did not lead to any further knee damage.

**C. No-kneel restriction**

All inmates in the Restricted Housing Unit (where Key was housed for at least part of the events of this case) must kneel when exiting or entering their cells for staff to apply ankle restraints, unless an inmate has a "no-kneel" restriction.

On November 19, 2015, Key submitted a health service request asking for a "no-kneel" restriction because of his "damaged right knee." *Id.* at 708. The request was referred to CCI's "Special Needs Committee" that day. Under DOC Bureau of Health Services policy No. 300.07, CCI used a Special Needs Committee, a group of medical, security, and other officials, to decide prisoner requests for "special needs" or "comfort items." A prisoner's treating medical staff are generally directed to refer requests for health-related property items or accommodations to the committee rather than write orders for these things themselves. The medical official on the committee reviews the prisoner's records to determine if the item or action requested by the inmate is medically necessary. If there is no demonstrated health need for the restriction requested, the non-medical-staff committee members defer to the medical-staff committee member's determination when denying the request. For requests like "no-kneel" restrictions, where security staff is affected, the security-staff representative has more

6

input in the determination, but medical need ultimately trumps security concerns. Conditions such as pregnancy, morbid obesity, degenerative knee disease, total knee replacement, or being over age 65 would all be reasons to conclude that a no-kneel restriction was medically necessary.

Defendant Nurse Anderson was the medical-staff member of CCI's committee during the relevant time. Pamela Schmidt and Don Morgan, non-medical staffers, were the other committee members. They reviewed Key's request and his medical record, which showed that he had been receiving care for his reports of right knee pain, as detailed above. The committee determined that a no-kneel restriction was not medically necessary, that Key's knee pain was adequately treated, and that Key was noncompliant with his plan of care to complete physical therapy, so the committee denied the request.

Key says that he does have degenerative knee disease, citing a 2013 report stating that he has "mild degenerative changes" and "mild degenerative spurring" in his left knee (not the knee for which he was receiving treatment during the events of this case). Dkt. 39-2, at 1.

In late 2015 and 2016, because Key did not have a no-kneel restriction, defendant Correctional Officer Conroy did not exempt Key from the requirement that he kneel upon entering or exiting his cell.

ANALYSIS

Key brings Eighth Amendment and Wisconsin-law negligence claims against defendants for failing to properly treat his injured knee and the pain associated with it. More specifically, Key alleged the following in his complaint:

- Defendants Mashak, Syed, and O'Brien ignored Key's medical problems, persisted in ineffective medical treatment for his injured knee, and prescribed him unsafe medication.

7

- Key asked the Special Needs Committee for a no-kneel restriction, but defendants Perrenoud, Anderson, Schmidt, and Morgan denied the request.
- Defendant Conroy forced Key to kneel when Conroy came to his cell to put him in ankle restraints.

## A.  Claim and issue preclusion

This is Key's second lawsuit about his treatment following his 2014 knee injury. The first was case no. 15-cv-673-jdp, for a complaint originally filed in state court in September 2015. I granted summary judgment to the defendants in that case—Mashak and Perrenoud, who are defendants in this case, and Karl Hoffmann, who is not. *See* Dkt. 38 and Dkt. 58 in the '673 case. I concluded that defendants' treatment decisions were matters of medical judgment and that Key failed to show that they consciously disregarded his medical needs. *Id.* Because of my rulings in that case, defendants contend that most of Key's claims should be dismissed under the doctrines of claim preclusion and issue preclusion.

Under the doctrine of claim preclusion, a final judgment on the merits of an action precludes a party from re-litigating issues that were raised or could have been raised in the prior action. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Under federal law, claim preclusion has three elements: (1) the parties in the two suits must be actually or functionally the same; (2) the claims in the two suits must arise out of the same set of operative facts or the same transaction; and (3) there must a final judgment on the merits in the first case. *Bernstein v. Bankert*, 733 F.3d 190, 226 (7th Cir. 2013).

Defendants contend that Key's claims against Mashak and Perrenoud in this lawsuit are barred on claim preclusion grounds because he already lost similar claims against them in the '673 lawsuit. Key argues against claim preclusion by saying that at least some of his claims were not resolved on the merits; they were dismissed because Key failed to present evidence

8

that could lead a reasonable jury to conclude that defendants consciously disregarded his problems. Key is incorrect about what a "decision on the merits" means. Dismissal of claims because a plaintiff fails to present enough evidence to support his claims at summary judgment is indeed a decision on the merits of the case.

But that still leaves the question about the scope of the previous case's preclusive effect. Key's allegations in the '673 case were about treatment decisions that occurred before September 2015, when Key filed his complaint in state court (both the '673 case and this case were removed to this court). So claim preclusion applies to claims that Key brought or could have brought against the defendants in that September 2015 complaint. I will dismiss Key's Eighth Amendment and state-law claims regarding Mashak's and Perrenoud's misconduct occurring before his September 2015 complaint.

Defendants take that a step further: they say that claim preclusion should also apply to post-September 2015 allegations against Mashak or Perrenoud that Key could have added to the '673 case. For instance, I granted summary judgment to defendant Perrenoud in the '673 case on claims that she failed to intervene in Key's care in her role reviewing inmate grievances. In this case, Key brings a claim about Perrenoud for denying his December 2015 request for a "no-kneel" restriction. Perrenoud's alleged misconduct postdates the date of Key's complaint in the '673 case but occurred well before I granted summary judgment to Perrenoud in that case. Defendants argue that claim preclusion should apply to this claim because Key could have amended his complaint in the '673 case to include it. I'll reject this argument because the Court of Appeals for the Seventh Circuit has held that claim preclusion "does not bar a suit based on claims that accrue after a previous suit was filed. . . . [T]here is no legal duty to amend rather than bring a fresh suit." *Smith v. Potter*, 513 F.3d 781, 783 (7th Cir. 2008).

Defendants also contend that all of Key's federal and state claims directly about medical treatment (not the "no-kneel" restriction claims), regardless of defendant, should be dismissed under the doctrine of issue preclusion because "[t]he issue of allegedly ineffective treatment for his right knee injury sustained on November 29, 2014 was an issue that Key pursued in [the '673 case]." Dkt. 33, at 7. But this is a far too broad reading of the concept of issue preclusion. My rulings in the '673 case concerned the specific allegations against the specific defendants in that case. Applying issue preclusion the way defendants want would immunize prison officials from culpability for any action, no matter how malevolent, occurring after a plaintiff lost a lawsuit about the early phases of his treatment. Claim preclusion already bars Key from bringing claims that could have been part of the '673 lawsuit. His other claims involve treatment decisions that were not part of my rulings in the '673 case, so I will not apply issue preclusion to any of them.

**B. Eighth Amendment claims**

Key brings Eighth Amendment claims against each of the defendants. The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the

defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

1. **Defendant Syed**

I'll start with defendant Dr. Syed, who assumed responsibility for Key's treatment at CCI from Dr. Hoffman at some point in early 2015. Key alleges that Syed persisted with treatment that did not work even though Key complained about it. In particular, Syed continued to prescribe Key pain medication that was not effective and he would not consider new treatments until Key completed physical therapy. Key also says that at the tail end of Syed's time treating him, he prescribed him medication that was unsafe because it was duplicative of other medication he was already receiving.

A prison medical provider can violate the Eighth Amendment despite providing some care if the provider "persists in a course of treatment known to be ineffective" or a provider's decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016). But in considering these issues I must consider the totality of care that Key received, not just pick apart individual decisions. *Id.* at 728.

Given the totality of care that Syed provided Key, no reasonable jury could conclude that he acted with conscious disregard to Key's pain. The Eighth Amendment does not give

11

prisoners the right to demand specific treatment nor does it guarantee successful treatment. The question is whether Syed consciously disregarded Key's pain. The medical record shows that Syed attempted multiple reasonable ways to treat his pain.

In April 2015, Syed noted that Key was already prescribed naproxen and a knee sleeve. He added prescriptions for ice and acetaminophen 1000 mg, and he ordered further therapy. In July 2015, in response to Key's complaints of continued pain, Syed ordered an MRI, a consultation with orthopedics, and he continued naproxen and ice. In October, Syed gave him a cortisone injection for the pain and referred him to defendant O'Brien. In November, Syed followed O'Brien's recommendation for physical therapy by ordering therapy. In February, Syed again referred Key to O'Brien to see if he needed another MRI or physical therapy because of his continued complaints of pain, and in June he referred Key back to physical therapy to meet O'Brien's requirement that Key needed to complete physical therapy before other treatment methods would be considered. Syed also prescribed Key muscle rub and nortriptyline, and he renewed Key's naproxen.

Key contends that Syed consciously disregarded his pain because the naproxen wasn't effective, and he states that long-term use of naproxen can be harmful. But the naproxen was only one component of Key's treatment; Syed kept trying other treatments as well. And Key does not produce evidence supporting his theory that the naproxen was harmful to him in the doses provided. The fact that Syed was unable to completely alleviate Key's pain might be a question of medical malpractice, or it might reflect the unfortunate reality that not all chronic pain can be eliminated. But it is not enough to show that Syed consciously disregarded his pain.

Key makes an argument about Syed's declaration containing a falsehood: in his declaration, Syed states that "[b]ased on [his] clinical judgment, Key did not require a pain medication other than naproxen, therefore [he] did not prescribe any other medication." Dkt. 36, at 5, ¶ 19. Key says that Syed knows this statement is untrue because in June 2016 Syed did indeed prescribe him another medication for pain—nortriptyline.[2] Although the parties do not raise this point, I note that Key's medical record shows that Syed prescribed other pain medications as well: acetaminophen and a cortisone shot. Syed also prescribed ice, muscle rub, and physical therapy. Syed responds that it's a "non starter" to accuse him of lying about his belief in the efficacy of naproxen just because he did not recount every interaction with Key or every prescription that he tried with Key. Dkt. 43, at 7.

Syed's testimony about his own state of mind isn't something that automatically entitles him to summary judgment; Key is free to produce evidence about his treatment in an effort to show that Syed disregarded his medical needs, regardless of Syed's stated opinions about his own treatment decisions. I agree with Key that Syed is incorrect in saying that he did not prescribe Key other medications. As for Syed's statement that, in his judgment, Key did not require anything other than naproxen, that too appears to be contradicted by Syed's other prescriptions.

Syed's incorrect statements show sloppiness on his or counsel's part in crafting their summary judgment materials. But they don't materially affect Key's claims, so the issue is irrelevant to the summary judgment analysis. The medical record shows what Syed did to treat Key, and the question is whether a reasonable jury could conclude from those events that Syed

---

[2] Key brings a separate claim about the nortriptyline that I'll discuss below.

consciously disregarded Key's pain. That fact that Syed prescribed other medications in addition to naproxen actually cuts against Key's conscious-disregard claim, because it shows that Syed remined willing to try different treatments. Key's contention that Syed left him to languish in pain does not square with the undisputed facts that Syed attempted several different treatments over the 16-month period. Given Syed's various efforts, no reasonable jury could conclude that Syed consciously disregarded Key's pain.

Key also contends that Syed's treatment violated the Eighth Amendment because Syed would not consider new treatments until he completed physical therapy, even though he already had completed therapy. In screening the complaint it was unclear what Key meant by his statement that he had already completed physical therapy. The record here shows that Key indeed completed a *round* of therapy in early 2015. But that doesn't mean that additional therapy would be futile. Both Syed and O'Brien thought that further therapy would be useful, and the report from his earlier therapy said that Key felt 60% better after the therapy. Also, Syed's orders following O'Brien's recommendations for therapy are not evidence of conscious disregard: Syed was entitled to rely on the medical opinion of the orthopedic expert.

As for Key's claim that Syed unsafely prescribed him nortriptyline because he was already taking a different antidepressant, Key does not present any evidence supporting an Eighth Amendment conscious-disregard claim, not even evidence that he was harmed by the nortriptyline. All that leaves is Key's speculation that prescribing two antidepressants at a time would harm him, which is not enough to survive summary judgment. *See, e.g.*, *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). So I will grant

defendants' motion for summary judgment on all of Key's Eighth Amendment claims against Syed.

### 2. Defendant O'Brien

Key alleges that defendant O'Brien, a DOC orthopedic specialist, violated his Eighth Amendment rights by refusing to evaluate him until he completed physical therapy and by failing to give him better pain medication. But O'Brien did evaluate Key, just not in person. She reviewed his medical records, including the MRI, and recommended physical therapy.

There was at least a several-month delay in Key obtaining therapy. Defendants argue that the delay in treatment was Key's fault because he refused therapy, but there isn't enough evidence of this to consider that fact undisputed. Defendants give an example of one appointment that Key missed, in September 2014. The parties seem to agree that Key at some point avoided therapy because he thought that his previous therapy hurt too much, but neither side points to any evidence explaining when Key said this or to whom. Otherwise the main cause of Key failing to complete physical therapy appears to be his placement in segregation, where therapy was unavailable.

Regardless, O'Brien wasn't responsible for withholding therapy, and she exercised medical judgment in deciding that Key should complete therapy before attempting other treatment, so no reasonable jury could conclude that she consciously disregarded Key's needs. O'Brien's review of Key's medical records led her to believe that his injury should be treated by therapy first, before other interventions, in part because physical therapy strengthens the area of injury, leading to a better chance for success following surgery. He also wasn't harmed by the delay: after reviewing the results of Key's 2017 surgery, O'Brien concluded that Key's injury was not exacerbated by her requiring physical therapy before surgery. As for the pain-

15

medication issue, Key was still being directly treated by his primary physician at CCI, defendant Syed, and I already concluded that Syed did not consciously disregard Key's pain. So O'Brien's failure to add any additional pain medication to Syed's treatment didn't violate the Eighth Amendment either.

### 3. Defendant Mashak

Defendant Mashak was the CCI Health Services Unit Manager during the events of this case. Key alleged that Mashak was directly responsible for supervising the medical staff at CCI, and that she did not intervene in his care after Key complained about it. But at summary judgment, Key does not provide evidence supporting these claims. The parties agree that Mashak responded to Key's complaints about his care shortly after his injury, in December 2014, but his claims about that time period are barred by claim preclusion. Key attempts to show that Mashak was involved in later decisions by citing an "exhibit 22(a)," a document that he does not attach to his summary judgment materials and that I cannot locate elsewhere in the record. *See, e.g.*, Dkt. 41, at 3, ¶ 27. At summary judgment, the plaintiff must "put up or shut up" and "show what evidence [she] has that would convince a trier of fact to accept [her] version of events." *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Key hasn't done so with respect to Mashak. And in any event, I have already concluded that neither Syed nor O'Brien consciously disregarded his needs; Mashak didn't violate the Eighth Amendment by failing to intervene in that care.

### 4. Special Needs Committee defendants

Defendants Anderson, Schmidt, and Morgan served on the Special Needs Committee that denied Key's request for a no-kneel restriction. Anderson says that the committee denied Key's request because it wasn't medically necessary, his knee pain was already being treated,

16

and he was non-complaint with the order for physical therapy. It's at least disputed whether it was Key's fault for not participating in therapy or whether he was blocked from participating because of his placement in segregation. But the committee's other stated rationales for denying the request are sound and do not raise an inference of conscious disregard. Anderson noted that Key was already receiving treatment for his pain and that the knee sleeve should correct the problem with his patella tracking.

Key contends that his medical record showed that he had one of the maladies—degenerative knee disease—that would usually support a no-kneel restriction as being medically necessary. But he cites a 2013 x-ray stating that he had "mild degenerative changes" and "mild degenerative spurring" in his *left* knee, which was not the subject of his special needs request. Defendants note that neither the August 2015 nor the 2016 MRIs of his right knee include a reference to degenerative knee disease. So while Key may not agree with the committee's decision, there is no evidence that could lead a reasonable jury to conclude that they consciously disregarded his problem.

### 5. Defendant Perrenoud

I granted Key leave to proceed on a claim that defendant Nursing Coordinator Perrenoud and others on the Special Needs Committee denied his request for a no-kneel restriction. At summary judgment, it's undisputed that Perrenoud was not part of the committee. As with defendant Mashak, Key cites exhibit 22(a) to support his contention that Perrenoud could have overruled the committee's decision, but that document that is not in the record. So Key fails to show that Perrenoud was personally involved in denying his request for a no-kneel restriction. I'll grant summary judgment to defendants on the Eighth Amendment claim against Perrenoud.

### 6. Defendant Conroy

Key brings an Eighth Amendment claim against defendant Correctional Officer Conroy for forcing him to kneel in his cell despite kneeling causing Key severe pain. But the evidence shows that prison policy dictated that all Restricted Housing Unit inmates must kneel in their cells when entering or exiting their cells, unless an inmate has a no-kneel restriction. Conroy told Key that he didn't have the power to ignore the kneeling policy.

Key suggests that Conroy could have taken Key's complaints of pain to medical staff, or simply ignored the policy and not forced Key to kneel given his pain. Conroy's failure to do those things doesn't violate the Eighth Amendment. One could imagine a scenario in which a correctional officer would have the obligation to ignore the kneeling rule—for instance, if an inmate suffered a severe injury right in front of the correctional officer, requiring the officer to seek help from a medical professional. But here, Key had a longstanding medical problem and there was a procedure for Key to ask for relief from the kneeling policy. Medical staff and the Special Needs Committee were already aware of his injury, and Key's request for a no-kneel restriction was denied. Conroy was entitled to rely on the decisions made by medical experts rather than ignoring prison policy. So I'll grant defendants' motion for summary judgment on this claim.

## C. Wisconsin-law claims

I am dismissing all of Key's Eighth Amendment claims.[3] That leaves Key's state-law claims for medical malpractice or negligence. Ordinarily, when this court dismisses all of the federal claims in a lawsuit before trial, it will dismiss the supplemental-jurisdiction state-law

---

[3] Because I am dismissing each of Key's Eighth Amendment claims on other grounds, I need not consider defendants' argument that they are entitled to qualified immunity.

claims without prejudice, leaving the plaintiff free to pursue those claims in state court. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). But I may still dismiss state-law claims if they clearly have no merit and it would be inefficient to leave the claims open the state courts. *See Korzen v. Local Union 705*, 75 F.3d 285, 288–89 (7th Cir. 1996). I've already concluded that claim preclusion applies to claims against Mashak or Perrenoud for events taking place before Key's September 2015 complaint in the '673 case. So those claims will be dismissed with prejudice. Because this case originated in the Dane County Circuit Court, the remainder of Key's state-law claims will be remanded to that court.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 32, is GRANTED in part. All of plaintiff Prince D. Key's Eighth Amendment claims and his state-law claims against defendants Meredith Mashak and Keisha Perrenoud subject to claim preclusion are DISMISSED with prejudice.

2. Plaintiff's remaining state-law claims are REMANDED to Dane County Circuit Court.

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered June 19, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge